IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **4:14CR3072** |
| vs. | |
| ALEX GARDEN, | **FINDINGS, RECOMMENDATION, AND ORDER** |
| Defendant. | |

## INTRODUCTION

The defendant has moved to suppress all evidence and statements obtained by law enforcement officers from the defendant or his cellphone on September 18, 2013, along with the fruit of that evidence.  (Filing No. 31).  Defendant argues all statements he made "during the custodial interrogation and all evidence obtained from the warrantless search of his cellphone, as well as any and all evidence derived from the statements and warrantless search" were "obtained as a direct result of violations of the defendant's constitutional rights . . . ."[1]  (Filing No. 31, at CM/ECF p. 2).

The defendant claims he was unlawfully detained and his cellphone was searched without a warrant or his consent.  The government argues that Defendant's rights were not violated, and even if Defendant was unlawfully detained, Defendant's consent to the search of his cellphone purged the taint of that detention.  Upon review of the credible

---

[1] Although Defendant's motion mentions an alleged violation of the Sixth Amendment, he did not brief or argue this issue.  Any Sixth Amendment claim is deemed abandoned. Moreover, no evidence was offered in support of a Sixth Amendment claim; that is, the defendant never clearly invoked his right to counsel during the events at issue on Defendant's motion to suppress.  As to any claim related to the defendant's statements, his brief states any Miranda waiver was invalid because it was "a direct result of the product of the unlawful arrest." The brief also mentions the Miranda waiver was "coerced," (Filing No. 33, at CM/ECF p. 5), but that passing reference is not further discussed in the brief.  The court has therefore interpreted Defendant's argument as to the statements as solely a Fourth Amendment claim seeking suppression of the statements as fruit of the alleged illegal detention.

evidence, and for the reasons discussed below, Defendant's motion to suppress should be denied.

## STATEMENT OF FACTS

Prompted by a cyber tip received from Tagged.com, (a social networking and dating website, (Filing No. 49, at CM/ECF p. 113, Ex. 1)), in August of 2013, the Nebraska State Patrol (NSP) initiated an investigation to determine whether Defendant was engaged in crimes involving child pornography.   As explained in the warrant application prepared by NSP Investigator Corey Townsend:

- On July 24, 2013, Tagged.com reported a February 2013 incident of child pornography to the National Center for Missing and Exploited Children (NCMEC).  NCMEC forwarded that report to NSP on August 9, 2013.

- In response to NSP's investigation, Tagged.com provided records of a sexually explicit email conversation which also referenced the exchange of nude photographs between a 13-year-old user from Lincoln, Nebraska named "Kenzie Garden" and a 16-year-old user from Huron, Tennessee named "Jill Funny." According to the Tagged.com information, the user identified as Kenzie Garden was using the email address, kenziegarden@yahoo.com.

- NSP was unable to find anyone named Kenzie Garden in Lincoln, Nebraska.  But according to records received from Time Warner Cable, the IP address the Tagged.com user identified as "Kenzie Garden" was issued to Defendant Alex Garden at his residence, 7146 Kearney Avenue, Lincoln, Nebraska.

- Defendant Alex Garden has a criminal history of sex-related offenses.

Ex. 1.  In addition to the information outlined in the warrant application, the cyber tip from Tagged.com included the photograph of a young woman, clothed and standing in front of a mirror.  (Filing No. 49, at CM/ECF pp. 103, 105).

2

Based on the information collected, NSP suspected Kenzie Garden did not exist, that no 13-year-old lived at 7146 Kearney Avenue, Lincoln, Nebraska, and that the occupant of that residence, Defendant Garden, was using a fictitious account and posing as a juvenile female to engage in criminal activity involving child pornography.  (Filing No. 49, at CM/ECF pp. 83-87).  To further the NSP investigation, early on the morning of September 18, 2013, Investigator Townsend submitted his application to Lancaster County District Court Judge Jodi Nelson requesting a warrant to search Defendant's residence.  (Filing No. 49, at CM/ECF pp. 67, 69, Exs. 1 & 2).  Judge Nelson granted the application and signed the search warrant.  (Filing No. 49, at CM/ECF p. 69).

Shortly after the warrant was issued, NSP Sergeants Brian Jones and Eric Jones, and Investigators Townsend and David Hanselmann met at the NSP criminal investigations office for a briefing by NSP Investigator Drew Ferguson on how the warrant would be executed.  (Filing No. 49, at CM/ECF pp. 18-19, 69, 130).  As conveyed during the briefing, the officers were aware that Defendant worked for Midwest Refuse as a garbage collector and would likely be at work when the officers arrived at the house to execute the warrant.  Since Defendant was mobile during his work day, and knowing Defendant possessed a permit to conceal and carry a firearm, (Filing No. 49, at CM/ECF pp. 12, 35, 71), the officers were concerned that Defendant would arrive at the house unannounced during the search—which posed a risk of misunderstanding or surprise and concerns for officer safety.  In addition, the officers were concerned that if the defendant became aware that his house was being searched (for example, through a call from a neighbor), then Defendant could destroy evidence using remote access and cloud storage technology.  (Filing No. 49, at CM/ECF pp. 49, 53, 70, 135).  Sergeant Ferguson assigned two officers, Sergeant Brian Jones and Investigator Hanselmann, to contact the defendant at his place of employment and detain him while the search was conducted.  (Filing No. 49, at CM/ECF pp. 5, 19, 48, 69, 87, 130).

Investigator Townsend, Sergeant Eric Jones, and Sergeant Ferguson went to the defendant's home to execute the warrant, with Sergeant Eric Jones assigned as the evidence officer. (Filing No. 49, at CM/ECF pp. 69, 87, 114). Since they suspected the defendant possessed child pornography, all the officers were interested in locating and securing Defendant's cellphone as possible evidence. (Filing No. 49, at CM/ECF pp. 24-25).

Investigator Townsend and Sergeants Eric Jones and Ferguson began executing the search warrant at the residence at 10:15 a.m. (Filing No. 49, at CM/ECF p. 109). At the same time, Sergeant Brian Jones and Investigator Hanselmann arrived at Midwest Refuse, wearing  street clothes, displaying their badges, and driving an unmarked Ford Escape. (Filing No. 49, at CM/ECF pp. 5, 38). After identifying themselves, they asked the manager to contact the defendant, stating they needed to speak with Defendant as soon as possible. (Filing No. 49, at CM/ECF pp. 7, 21, 50). The manager contacted the defendant. Before he received this call, a neighbor had notified the defendant that law enforcement officers were at the defendant's home and had handcuffed and removed his girlfriend from the residence. Upon receiving the call from his manager, Garden knew something was happening at his house. (Ex. 3, (DS340353), 50:40-51:00). Garden arrived at the Midwest Refuse office approximately 15 to 20 minutes later driving a large garbage truck. (Filing No. 49, at CM/ECF p. 7).

When Defendant exited the garbage truck, the officers left the lobby of Midwest Refuse and met the defendant in the business' parking lot. (Filing No. 49, at CM/ECF pp. 8, 52). The officers identified themselves as state troopers and explained that Defendant's house was currently being searched pursuant to a warrant. They explained they did not want the defendant to arrive at the house, unannounced, during that search. (Filing No. 49, at CM/ECF pp. 38, 52). The officers advised the defendant he was being

detained as part of an ongoing investigation, and they handed him a copy of the search warrant for his review.   (Filing No. 49, at CM/ECF pp. 9, 23).   After the defendant reviewed the warrant, Sergeant Brian Jones asked the defendant if he was willing to go to Defendant's house.   Defendant agreed to do so.   (Filing No. 49, at CM/ECF pp. 10, 39). Sergeant Jones advised the defendant he would be transported to the home in the officer's vehicle.   The defendant was handcuffed to limit his access to any concealed weapon.   He was then pat-searched to look for weapons and in preparation for transport.   (Filing No. 49, at CM/ECF pp. 11-12, 23, 62).   The defendant was again advised he was being detained, but he was not under arrest.   (Filing No. 49, at CM/ECF pp. 17, 39).   Since the defendant was being transported in an unmarked vehicle with no cage, he needed to remain handcuffed for officer and public safety.   (Filing No. 49, at CM/ECF pp. 5, 53, 54, 63-64).   The defendant was so advised,   (Filing No. 49, at CM/ECF pp. 39-40, 43), and did not object to remaining handcuffed while in the vehicle.   (Filing No. 49, at CM/ECF p. 43).

Officer Hanselmann asked the defendant if there was anything in the truck Defendant needed to retrieve before they left the Midwest Refuse location.   (Filing No. 49, at CM/ECF pp. 13, 40).   The defendant stated he had a wallet, keys, and a cellphone in the truck.   Since the officers did not know whether the defendant had a weapon in the truck, or whether he would conceal evidence if given access to the truck, the defendant was not permitted to go to the truck himself and collect his personal items.   (Filing No. 49, at CM/ECF pp. 27, 35).   Instead, Officer Hanselmann asked the defendant for consent to retrieve the wallet, keys, and cellphone from the truck.   Defendant consented with no equivocation or objection.   (Filing No. 49, at CM/ECF pp. 13, 25, 41-42, 55).

As Officer Hanselmann went to the garbage truck and gathered Defendant's cellphone, keys and wallet, Sergeant Brian Jones placed the defendant, still in handcuffs, in the front passenger seat of the Ford Escape.   Sergeant Brian Jones drove. (Filing No.

49, at CM/ECF p. 14).  Officer Hanselmann, who was seated in the rear passenger area behind the defendant, retained possession of Defendant's cellphone, keys and wallet, (Filing No. 49, at CM/ECF pp. 29, 26, 33, 42, 59).  He did not search any of these items. (Filing No. 49, at CM/ECF p. 46).  The officers did not advise the defendant of his Miranda rights prior to or during Defendant's transport to his home. (Filing No. 49, at CM/ECF pp. 34, 45).  No questions were asked by either of the officers or by the defendant after Defendant was handcuffed and during transport.  (Filing No. 49, at CM/ECF pp. 15, 42).

Sergeant Brian Jones, Officer Hanselmann, and the defendant arrived at the defendant's house at approximately 11:05 a.m.  During the entire encounter between these officers and the defendant in the parking lot, and until they arrived at Defendant's house, Defendant was calm, cooperative, and appeared to understand the officers' statements.  He did not appear to be under the influence of drugs or alcohol.  The defendant was not threatened, and no weapons were brandished.  The officers did not lie to him or misrepresent the facts to elicit Defendant's cooperation.  The defendant never requested an attorney, or the opportunity to speak with his father who is an attorney. (Filing No. 49, at CM/ECF pp. 11-12, 16-17, 39, 42-43, 46).

Upon arriving at Defendant's house, Sergeant Brian Jones, Investigator Hanselmann, and the defendant were met at the front of the house by Investigator Townsend, and Sergeants Eric Jones and Ferguson.  (Filing No. 49, at CM/ECF pp. 17, 30, 44).  Investigator Hanselmann placed the defendant's cellphone, wallet and keys on the hood of the Ford Escape, (Filing No. 49, at CM/ECF p. 60), and Sergeant Eric Jones took possession of these items.  (Filing No. 49, at CM/ECF pp. 44, 109).  When the defendant exited the Ford Escape, his handcuffs were removed.  (Filing No. 49, at CM/ECF pp. 60, 130-31).

Investigator Townsend and Sergeant Ferguson introduced themselves to the defendant. The defendant was then seated in the front passenger area of Sergeant Ferguson's vehicle. Investigator Townsend sat in the driver's seat and Sergeant Ferguson sat in the rear seat behind the defendant. (Filing No. 49, at CM/ECF pp. 72, 131). Investigator Townsend used a small recorder to audio record the communications with the defendant. (Filing No. 49, at CM/ECF p. 73, Ex. 3)

The interview began at 11:17 a.m. At the outset, Investigator Townsend notified the defendant that the officers had received information indicating the defendant possessed child pornography. The officer then advised of the defendant of his Miranda rights. (Filing No. 49, at CM/ECF pp. 13, 74, Ex. 3 (DS340353), at 00:01-00:37). Investigator Townsend asked the defendant if he was willing to talk with the officers. The defendant commented that he had done nothing wrong and was willing to make a statement. (Filing No. 49, at CM/ECF p. 75, Ex. 3 (DS340353), at 00:37-01:04). During the course of the interview, the defendant never objected to any question asked and never asked for the questioning to stop. He never requested counsel. (Filing No. 49, at CM/ECF p. 81).

Investigator Townsend began the interview by explaining that the officers were investigating Defendant's involvement in child pornography crimes. He stated they were trying to determine the extent of the defendant's involvement in such activity, describing a spectrum from producer to unintentional download. They asked Defendant for his definition of illegal pornographic images, and they asked him to identify the websites he visits, the social media sites he uses, and his usernames for those sites. They asked him if he engages in online conversations. (Ex. 3 (DS340353), at 00:37-9:00). Investigator Townsend then asked, "Is it okay if our guys search your phone, too?," and without hesitation, the defendant consented. (Filing No. 49, at CM/ECF pp. 78-80, 110, 139, Ex. 3 (DS340353), at 09:04-09:12).

Sergeant Eric Jones took possession of the cellphone, and after adjusting its settings, began extracting its contacts, text messages, calendar notes, tasks, call logs, media messages, images, ringtones, and audio and video recordings using a Cellebrite examination tool. (Filing No. 49, at CM/ECF pp. 80, 95, 111, 119). Cellebrite can extract this data without the risk of inadvertent alterations of the phone's data due to human error. (Filing No. 49, at CM/ECF pp. 111, 120, 125-26). The data collected using Cellebrite was stored on a thumb drive. (Filing No. 49, at CM/ECF p. 111). Sergeant Jones then began a manual review of the cellphone, including the email content and browser history. As a final step, he removed the phone's SD card and delivered that to state patrol analyst Terry Olson for further review. (Filing No. 49, at CM/ECF pp. 111-112, 122).

While reviewing the cellphone's content, Sergeant Eric Jones located a photograph matching the photograph of the woman depicted through the Tagged.com cybertip. (Filing No. 49, at CM/ECF pp. 96, 104). Believing the phone contained evidence of criminal activity, Sergeant Jones seized the phone. (Filing No. 49, at CM/ECF p. 82). The defendant did not request his phone or object when told the officers were keeping it. (Filing No. 49, at CM/ECF pp. 83, 104, 134).

Sergeant Eric Jones showed the photograph to Investigator Townsend who likewise recognized it as the image from the cyber tip. When Investigator Townsend confronted Defendant about the image, (Filing No. 49, at CM/ECF p. 97, Ex. 3 (DS340354) at 00:30-01:00), the defendant denied any wrongdoing and stated, "If you don't believe me, I could get my attorney involved." (Ex. 3 (DS340354) at 5:30-45). But he never clearly and unambiguously stated he wanted counsel. During the questioning and discussion between Defendant and the officers, the defendant was not handcuffed. His request to smoke a cigarette was promptly granted, with the officers assisting in

locating a lighter.  The officers' tone was conversational and professional throughout. Defendant was not threatened and was not under the influence of drugs or alcohol.  He made no demands, was not argumentative, never asked to leave, and did not request that the interview cease or refuse to answer any questions.  (Filing No. 49, at CM/ECF pp. 75-76, 103, 133-34, Ex. 3, (DS340353) at 40:05-41:15.).

When the interview was over and the residential search was complete, at Defendant's request, Investigator Townsend and Sergeant Ferguson drove the defendant back to this place of employment, (Filing No. 49, at CM/ECF p. 81), arriving back at work  approximately two hours after he was initially detained.  (Filing No. 49, at CM/ECF pp. 99, 102).

A warrant was obtained to search the cellphone. (Filing No. 49, at CM/ECF p. 82, Ex. 4).  During that search, Sergeant Eric Jones and Analyst Olson located an image of a white female standing in a bathroom photographing herself—the same image reported by Tagged.com in the cyber tip received by the officers.  (Filing No. 49, at CM/ECF p. 113).

## ANALYSIS

The issues presented include:

- whether Defendant was unlawfully detained during the search of his home;

- whether Defendant consented to the search of his cellphone;

- whether the officers' search of the cellphone exceeded the scope of Defendant's consent; and

- whether the taint of the officers' alleged unlawful conduct was purged by Defendant's consent to the search of his cellphone and to provide statements to the officers.

For the reasons discussed below, the undersigned magistrate judge finds the defendant was not unlawfully detained or interrogated, and his phone was not unlawfully searched.  And even if the detention was unlawful, Defendant's consent and cooperation with the officers' requests purged the taint of any Fourth Amendment violation.

      1.     <u>Detention During the Residential Search</u>.

The defendant argues his detention, which began at his employment and continued until the residential search was over, violated the Fourth Amendment.  The officers testified that Garden was detained for officer safety and to preserve the evidence by eliminating his ability to remotely access his computer.

In <u>Michigan v. Summers, 452 U.S. 692  (1981)</u>,  the Court held that to further the interests of crime prevention and detection and for officer safety, a person may be detained during the execution of a search warrant even absent reasonable suspicion that he or she is involved in criminal activity or poses a specific danger to the officers.  The defendant in <u>Summers</u> was detained as he walked down the front steps of the house being searched.

The ruling in <u>Summers</u> was clarified in <u>Bailey v. United States, 133 S. Ct. 1031, 1037 (2013)</u>.[2]   In <u>Bailey</u>, the defendant left the location of the search and was stopped and detained when he was approximately a mile away.  The Court held that under such circumstances, the detention was not legal unless the officers had reasonable suspicion of criminal activity or probable cause to arrest.  <u>Bailey</u> held "[b]ecause detention is justified by the interests in executing a safe and efficient search, the decision to detain must be acted upon at the scene of the search and not at a later time in a more remote place.

---

[2] <u>Bailey v. United States, 133 S. Ct. 1031, 1037 (2013)</u>, was decided on February 19, 2013.  The search of Defendant's residence occurred on September 18, 2013.

Bailey, 133 S. Ct. at 1042.   The Court explained that Summers is subject to a "spatial constraint" defined as "the immediate vicinity of the premises to be searched." Bailey, 133 S. Ct. at 1042.

> Limiting the rule in Summers to the area in which an occupant poses a real threat to the safe and efficient execution of a search warrant ensures that the scope of the detention incident to a search is confined to its underlying justification. Once an occupant is beyond the immediate vicinity of the premises to be searched, the search-related law enforcement interests are diminished and the intrusiveness of the detention is more severe.

Bailey v. United States, 133 S. Ct. at 1042.   See also United States v. Reinholz, 245 F.3d 765 (8th Cir. 2001).

Under the reasoning in Bailey, the NSP officers could not lawfully detain Garden at his place of work during the search of Garden's residence solely on the basis of securing officer safety or to facilitate the purpose and efficiency of the search.   Garden's employer was located several miles from the residence being searched, and although Garden was mobile during his job, there is no evidence the officers believed he was in close proximity to the home when the search began.

But the legality of a detention is judged by the objective facts known by the officers, not by the officers' stated justification.   "[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action so long as the circumstances, viewed objectively, justify that action."   Scott v. United States, 436 U.S. 128, 138 (1978).   The court must examine challenged police conduct "under a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved."   Scott, 436 U.S. at 138.   See, e.g., United States v. Lowe, 9 F.3d 43 (8th Cir.1993) (holding that even if the officers had no basis for stopping the defendant for driving the wrong way on one-way street, their purported basis for the stop, the stop

was lawful because the defendant failed to signal a turn); United States v. Bowman, 907 F.2d 63, 65 (8th Cir. 1990) (holding that even though the agents thought they were making a lawful investigatory stop, the government is not foreclosed at a later suppression hearing from proving probable cause justified the stop); Klingler v. United States, 409 F.2d 299, 303 (8th Cir. 1969) (holding that an arrest for vagrancy, though incorrect, was not unlawful where there was probable cause to arrest the defendant for robbery).   See also LaFave, 1 Search & Seizure, § 1.4(d) n. 30 & 41 (5th ed. 2014) (compiling cases).

Since the defendant was not in close proximity to his residence when he was initially detained, the lawfulness of his detention "is controlled by other standards, including, of course, a brief stop for questioning based on reasonable suspicion under Terry or an arrest based on probable cause." Bailey, 133 S. Ct. at 1042.  Under Terry, a person may be detained or stopped if there is a reasonable, articulable suspicion that he or she has or is engaged in criminal activity.   And the police are authorized to frisk the detained person if they have a reasonably objective basis for believing the suspect is armed and dangerous.  Terry v. Ohio, 392 U.S. 1 (1968).   The length of an investigatory detention "will vary to some extent with the particular facts and circumstances of each case," but "must be temporary and last no longer than is necessary to effectuate the purpose of the stop, and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's  suspicion in a short period of time."  Florida v. Royer, 460 U.S. 491, 500 (1983).   "An officer has probable cause to make a warrantless arrest when the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense."  United States v. Chappell, 779 F.3d 872, 877 (8th Cir. 2015).  "Arresting officers are not required to witness actual criminal activity or have collected enough evidence so as to justify a conviction for there to be a legitimate finding of probable cause to justify a warrantless arrest.  Instead, the mere "probability or substantial chance

of  criminal activity, rather than an actual showing of criminal activity," is all that is required.  Chappell, 779 F.3d at 877-78 (quoting United States v. Winarske, 715 F.3d at 1067).

The NSP officers had reviewed the graphic and sexually explicit language of the electronic communications between two persons, both stating they were girls under the age of 18.  Those communications indicated the two traded images of nude minors engaged in sexually explicit conduct.  The person profiled as a 13-year-old was using the internet email address, "kenziegarden@yahoo.com."  In response to a warrant, the internet provider revealed that the IP address for Tagged.com communications from that email address were from Defendant Alex Garden's internet account and his residence at 7146 Kearney Avenue, Lincoln, Nebraska.  The officers could not find anyone by the name of Kenzie Garden, and it was unlikely Alex Garden, who was 26 years old and had a criminal history of sex-related offenses, had a 13-year-old daughter.  Even in the absence of any evidence found in the defendant's home or on his computer, considered in the totality, the facts known by the NSP officers indicated Alex Garden was impersonating a 13-year-old girl named Kenzie Garden to engage in sexually implicit online conversations about child pornography with the goal of collecting images of child pornography.

At a minimum, the information contained in the search warrant supported a reasonable, articulable suspicion that Alex Garden had or was engaged in criminal activity such that detention for investigatory purposes was justified under Terry.  The court finds, however, that the evidence supported not only reasonable suspicion, but probable cause to arrest Alex Garden.  That is, based on the totality of the evidence, there was a "probability or substantial chance" that Alex Garden was engaged in possession and distribution of child pornography.

13

The defendant relies on United States v. Reinholz, 245 F.3d 765, 778 (8th Cir. 2001), in support of his motion to suppress.   In Reinholz, officers detained and handcuffed the defendant and drove him to his residence while it was being searched, claiming they had authority to do so under Summers.   The Reinholz court disagreed, concluding the defendant was unlawfully detained because the detention did not occur at a location adjacent to the location of the search and because, based on the evidence known by the officers at the time, the officers lacked probable cause to arrest the defendant.

In contrast, while they did not formally do so, the NSP officers did have probable cause to arrest Alex Garden when he arrived at his employer's parking lot on September 18, 2013.  Detaining the defendant while his residence was being searched did not violate the Fourth Amendment.   Evidence, including statements obtained, following the detention should not be suppressed as fruit of a Fourth Amendment violation.

> 2.    Consent to Search the Cellphone.

The defendant claims the officers' warrantless search of his cellphone, conducted during the search of his residence, violated the Fourth Amendment.  More specifically, the defendant claims he did not consent to the search, and even if he did, the officers' search of his cellphone exceeded the scope of any verbal consent given by the defendant. The government argues the search of defendant's cellphone was consensual and did not violate the Fourth Amendment.

> a.    Free and voluntary consent.

Consensual searches are reasonable under the Fourth Amendment.   Florida v. Jimeno, 500 U.S. 248, 250–51 (1991).  But any consent must be knowing and voluntary.

14

The government has the burden of proving by a preponderance of the evidence Defendant's consent to search was freely given.  United States v. White, 81 F.3d 775, 780 (8th Cir.1996).  In determining whether the prosecution has met that burden, the court considers the totality of the circumstances, including both the characteristics of the accused and the environment in which the consent was given.  United States v. Griffith, 533 F.3d 979, 984 (8th Cir. 2008) (citing United States v. Chaidez, 906 F.2d 377, 381 (8th Cir.1990)).  When assessing the voluntariness of a consent,  suspect characteristics which may be relevant include:

> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their Miranda rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system."

Griffith, 533 F.3d at 984.

> Relevant environment characteristics include:

> [W]hether the person who consented: (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or secluded place; or (6) objected to the search or stood silently by while the search occurred.

Griffith, 533 F.3d at 984.  These factors are not to be applied mechanically, but serve as a guide.

Defendant is an English-speaking adult who has prior experience with the legal system as a criminal defendant.  The officers advised the defendant of his Miranda rights be they requested consent to search the cellphone.  Defendant was not under the influence of drugs or alcohol, and was in a public area adjacent to his house.  He was not handcuffed when the officers requested consent, and he was not threatened or promised

15

anything to secure that consent. Investigator Townsend advised the defendant of his Miranda rights, and the officer's tone was cordial and professional. Defendant consented without hesitation, and he never withdrew that consent. The defendant knowingly and voluntarily consented to the search of his cellphone.

      b.      Scope of Defendant's consent.

"The standard for measuring the scope of a person's consent is 'objective reasonableness,' which asks what the typical, reasonable person would have understood from the exchange between the officer and the suspect." United States v. Beckmann, 786 F.3d 672, 677-78 (8th Cir. 2015). As recently explained by the Eighth Circuit:

> The scope of a consensual search is "generally defined by its expressed object." For example, where an officer asks to search a car for suspected narcotics, and the occupant agrees without explicit limitation on the scope of the search, the officer may search the entire car including containers therein that may hold narcotics. If the consent "would reasonably be understood to extend to a particular container" then "the Fourth Amendment provides no grounds for requiring a more explicit authorization." Reasonableness is measured in objective terms based on the totality of the circumstances. Where a person is present and fails to object to the continuation of a search, courts consider such circumstantial evidence to provide proof that the search conducted was within the scope of consent.

Beckmann, 786 F.3d at 678. "Where a suspect provides general consent to search, only an act clearly inconsistent with the search, an unambiguous statement, or a combination of both will limit the consent." Beckmann, 786 F.3d at 679.

The scope of Defendant's consent "is based on the totality of the circumstances including the interaction between the parties, the purpose of the search, and the circumstantial evidence surrounding the search." Beckmann, 786 F.3d at 679. At the outset of the defendant's contact with Sergeant Brian Jones and Investigator Hanselmann,

the defendant was shown a copy of the warrant to search his residence.  That warrant explained that officers were searching all computers within Defendant's home, including any computer files and file storage devices, to locate communications about, and images of, child pornography.  At the outset of Defendant's communications with Investigator Townsend and Sergeant Ferguson, Investigator Townsend explained that the officers were investigating Defendant's involvement in child pornography crimes, and asked him to disclose the websites he visits, any social media sites, his usernames and passwords for the websites and whether he engages in online conversations.  After asking this series of questions, and with the defendant fully aware of the scope of the residential search underway, Investigator Townsend asked, "Is it okay if our guys search your phone, too?"  The defendant consented to the search, and he never recanted that consent or expressed any limitation on the officers' examination of his phone. Under the totality of the circumstances, reasonable officers would have believed the defendant understood the officers intended to look at all data within the defendant's cellphone for evidence of child pornography.  Beckmann, 786 F.3d at 679 (holding a defendant who provided general consent to search his computer and then unplugged the external hard drive provided consent to search the entire computer, including the unplugged hard drive, where the defendant did not object when the officer re-connected the external hard drive and began searching it); U.S. v. Stapleton, 10 F.3d 582 (8th Cir. 1993) (holding officers were objectively reasonable in relying on the vehicle owner's consent to examine a cellphone where the passenger, who owned the phone, remained silent when told of the search and its purpose and made no statements limiting the scope of the consent).  See also., U.S. v. Coates, 685 F. Supp. 2d 551 (M.D. Pa. 2010) (holding that a defendant who handed his cellphone to an officer in a closed position, asked the officer to view a message on the phone, provided no instruction on where to look for the message, and did not mention that any contents of the cellphone were private, the officer's search of the telephone's contents and the discovery of child pornography did not exceed the scope of the defendant's consent); U.S. v. Galante, 1995 WL 507249 (S.D. N.Y. 1995) (holding that

whether a suspect in a narcotics investigation gave a generalized consent to search his car, extracting information from a cellphone and beeper within the vehicle did not violate the Fourth Amendment).

The officers did not unlawfully detain the defendant, their search of Defendant's cellphone was consensual, and the search performed did not exceed the scope of Defendant's verbal consent.[3]  Defendant's Fourth Amendment rights were not violated, and his motion to suppress the evidence found on the cellphone should be denied.  In addition, his motion to suppress all statements made to the officers and all evidence found during the in-depth search of the cellphone pursuant to a later-issued warrant (Ex. 4), as fruit of the unlawful detention and cellphone search should be denied.

3.    Purge the Taint.

The government argues that even assuming a Fourth Amendment violation occurred, Defendant's consent to the search of cellphone, and his consent to provide a statement to officers purged the taint of any unlawful detention.   When a Fourth Amendment violation precedes a defendant's grant of consent to search, the evidence obtained during the consensual search will not be suppressed as fruit of the prior violation if the government proves (1) that the defendant's consent to search was voluntary and (2) that the consent was an independent act of the defendant's free will that purged the taint of the Fourth Amendment violation.  United States v. Whisenton, 765 F.3d 938, 941 (8th Cir. 2014).  To determine whether the defendants consent purged the taint of an illegal detention, the court considers (1) the temporal proximity between the Fourth Amendment violation and the grant of consent to search; (2) the presence of any intervening

---

[3] Although the defendant cites Riley v. California, 134 S.Ct. 2473 (2014) in support of his motion to suppress, Riley is not applicable to the facts of this case.  Riley discussed to the authority to search a cellphone as incident to a defendant's arrest.  Unlike Riley, the search of Garden's cellphone was consensual.

circumstances; and (3) the purpose and flagrancy of the officers' Fourth Amendment violation.  The court also considers whether the defendant was advised of his Miranda rights before his consent was requested.  Whisenton, 765 F.3d at 941.

As previously discussed, defendant's consent to search his cellphone was voluntary.  For the same reasons, the court finds the defendant's waiver of his Miranda rights and his consent to respond to questioning was knowing and voluntary.  The defendant was initially detained at his place of employment.  When asked, he agreed to go to his residence while the search was being conducted.  And when he would have to be handcuffed during that transport for officer safety (the vehicle lacked a rear seat cage), the defendant agreed to that as well and did not withdraw his consent to be transported to his residence.

Garden was transported, in handcuffs, for about 20 minutes.  But as promised, those handcuffs were removed when he arrived at the residence.  Shortly after Garden arrived at his residence, he was seated in Investigator Townsend's vehicle.  After being advised of his Miranda rights, Defendant agreed to answer questions and waived his right to have a lawyer present.  Using a professional tone and demeanor, Investigator Townsend explained the purpose of the residential search and asked the defendant about his use of the internet and social media.  Garden was calm, was not intimidated, and repeatedly denied any connection with child pornography.  After nine minutes of conversation and questioning, Garden consented to the search of his cellphone without hesitation.

The time gap between being un-cuffed and granting consent to search the cellphone was likely no more than ten minutes.  But based on the audio recording, Defendant was composed and confident during his conversation with the officers, including when he agreed to answer their questions and when he consented to the search

of his cellphone.  As to both, Defendant's consent was provided with no hesitation or limitations.  The defendant responded to the officer's questions by maintaining his innocence and frequently suggesting that someone else was responsible for any images of child pornography in his possession.  Defendant congenially conversed with the officers, never asking to talk to a lawyer despite knowing attorneys he could have called.  Under the totality of these circumstances, Defendant's consent to respond to questioning and his consent to a search of his cellphone were intervening acts of free will sufficient to break the connection between the alleged unlawful detention and Defendant's consent to an interview and to the search of his cellphone.

The officers testified that they were detaining Garden for officer safety reasons.  If that was the only basis for detaining Garden, under Bailey, the detention would be unlawful.  But the officers did have probable cause to arrest the defendant, or at least reasonable suspicion sufficient to support an investigative detention.   Even so, Investigator Hanselmann did not collect the defendant's cellphone, wallet and keys without the defendant's consent.  With the defendant mobile and authorized to carry a concealed firearm, their officer safety concerns were justified.   Handcuffing the defendant prior to entering the front seat of Investigator Townsend's vehicle and during transport was justified for officer safety—initially to make sure the defendant did not have a weapon and thereafter to make sure he could not grab the steering wheel, cause an accident, and flee.  Under such circumstances, Defendant's detention did not violate his Fourth Amendment rights, and certainly not flagrantly.  See, e.g., Whisenton, 765 F.3d 942 (holding that where a house was illegally entered at gunpoint, the defendant's consent to search made 15 minutes later purged the taint of the illegal entry).

Garden's consent to respond to questioning and his consent to a search of his cellphone were voluntary and independent acts of free will sufficient to purge the taint of any Fourth Amendment violation.  The statements made by Garden, and the evidence

20

found when his cellphone was searched, should not be suppressed as fruit of an alleged illegal detention.

IT THEREFORE HEREBY IS RECOMMENDED to the Richard G. Kopf, Senior United States District Judge,  pursuant to 28 U.S.C. § 636(b), that the motion to suppress filed by the defendant (Filing No. 31) be denied in its entirety.

The defendant is notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

IT IS ORDERED that the jury trial of this case is set to commence before Richard G. Kopf, Senior United States District Judge, in Courtroom 1, United States Courthouse, Lincoln, Nebraska, at 9:00 a.m. on August 17, 2015, or as soon thereafter as the case may be called, for a duration of four (4) trial days.  Jury selection will be held at the commencement of trial.

June 29, 2015.

BY THE COURT:

s/ Cheryl R. Zwart
United States Magistrate Judge

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.