IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 4:14CR3072 |
| | ) | |
| Plaintiff, | ) | MEMORANDUM |
| v. | ) | AND ORDER |
| | ) | |
| ALEX GARDEN, | ) | |
| | ) | |
| Defendant. | ) | |

On June 29, 2015, Magistrate Judge Cheryl R. Zwart made findings of fact and recommended that the defendant's motion to suppress be denied in its entirety. The defendant, Alex Garden, has filed a statement of objections.

I have conducted a de novo review of the record.[1] While Judge Zwart's findings of fact are correct, I respectfully disagree with her recommendation that statements made by the defendant and evidence found when his cell phone was searched should not be suppressed. Specifically, I do not accept her legal conclusions that (1) the defendant was lawfully detained under *Terry v. Ohio*, 392 U.S. 1 (1968); (2) there was probable cause to arrest the defendant had the officers elected to do so; and (3) the defendant's consent to the search of his cell phone, and his consent to providing a statement to officers, purged the taint of any unlawful detention.[2] Accordingly, I will not adopt Judge Zwart's recommendation, but instead will sustain the defendant's objections and grant his motion to suppress in all respects.

Judge Zwart correctly determined that the officers were not authorized to detain Mr. Garden at his workplace solely for the purpose of executing a search warrant at

---

[1] A written transcript ("Tr.") of the hearing on the defendant's motion to suppress, held on May 15, 2015, is docketed as Filing No. 49.

[2] However, I agree with Judge Zwart's conclusion that the officers' search of the defendant's cell phone did not exceed the scope of his consent.

his residence. *See Bailey v. United States*, __ U.S. __, 133 S.Ct. 1031, 1042 (2013) (detention incident to execution of search warrant is limited to immediate vicinity of premises to be searched). To satisfy the Fourth Amendment, his detention "must be justified by some other rationale." *Id.*

Judge Zwart determined that "the information contained in the search warrant [for the defendant's residence] supported a reasonable, articulable suspicion that Alex Garden had or was engaged in criminal activity such that detention for investigatory purposes was justified under *Terry*." (Filing No. 53 at CM/ECF p. 13). Moreover, she found "there was a 'probability or substantial chance' that Alex Garden was engaged in possession and distribution of child pornography" (*id.*), such that "probable cause [existed] to arrest Alex Garden when he arrived at his employer's parking lot on September 18, 2013." (Filing No. 53 at CM/ECF p. 14.)[3]

The affidavit for the search warrant, which was prepared by Investigator Corey Townsend of the Nebraska State Patrol ("NSP") on September 18, 2013, stated the following pertinent facts:

> 7. On or about August 9, 2013 the Nebraska State Patrol received a cyber tip from the National Center for Missing and Exploited Children, from here on referred to as NCMEC.

> 8. On or about July 24, 2013 Tagged.com reported to NCMEC an incident of child pornography that occurred between February 25,2013 and February 26,2013.

> 9. Tagged.com provided records which show that at the reported time users 5985083688 (listed age on profile - 13 years old) and 5981995292 (listed age on profile - 16 years old) engaged one another in a conversation. The dialogue indicates they exchanged nude

---

[3] The validity of the search warrant is not at issue here.

photographs by email. User 5985083688 asked for photographs to be sent to kenziegarden@yahoo.com.[4]

&ast; &ast; &ast;

10. Tagged.com provided the following information about user 5985083688:

| | |
|---|---|
| Name: | Kenzie Garden |
| Address: | Lincoln, NE 68507 US |
| Date of Birth: | 01/01/2000 |
| Approximate Age: | 13 |
| Email Address: | kenziegarden@yahoo.com |
| Screen/User Name: | Kenzie G |
| ESP User ID: | 5985083688 |
| Profile URL: | http://[redacted] |
| IP Adress: [*sic*] | 76.85.163.55 (Registration) |

&ast; &ast; &ast;

11. A records search for Kenzie Garden in Lincoln, Nebraska was unsuccessful.

12. On or about August 16, 2013 Time Warner Cable was served a Lancaster County Attorney Subpoena for records and information associated with Internet Protocol address 76.85.163.55 [identified by Tagged.com as the IP address for user 5985083688] as of February 26, 2013 at 00:37:45 UTC.

13. On August 20, 2013 Time Warner Cable responded to a Lancaster County Subpoena. Time Warner Cable records indicate that on February 26, 2013 at 00:37:45 UTC Internet Protocol address 76.85.163.55 was issued to Alex Garden at 7146 Kearney Avenue, Lincoln, NE 68507. Time Warner Cable also reported that Alex Garden's current Internet Protocol address is 76.85.163.55.

---

[4] The sexually explicit dialogue is set out in the affidavit.

* * *

17. Records check of Alex Paul Garden indicate he has a history of sex related offenses.

a. Lincoln Police Department records show that on January 25, 2010 Alex P. Garden was contacted by officers after receiving a compliant [*sic*] from a female party that he sent a picture of his penis to her phone via text message.

b. A criminal history check of Alex Paul Garden, dob 05/30/1987, shows one conviction for soliciting a prostitute on August 22, 2008.

(Filing No. 41-1).

Even if this information was sufficient to create a reasonable suspicion that Mr. Garden possessed and distributed child pornography, it does not necessarily follow that his detention was justified under *Terry*. "An investigative stop must be temporary and must last no longer than is necessary to effectuate the purpose of the stop." *United States v. Dixon*, 51 F.3d 1376, 1380 (8th Cir. 1995) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality)). "Similarly, 'the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.'" *Id.* (quoting *Royer*, 460 U.S. at 500). "If the detention lasts too long, or if the officers' conduct is too intrusive, then the stop is converted into an arrest." *Id.*

Although "[t]here is no bright line of demarcation between investigative stops and arrests," [*United States v.*] *Miller*, 974 F.2d [953, 957 (8th Cir. 1992)], a *de facto* arrest occurs when "'the officers' conduct is more intrusive than necessary for an investigative stop,'" *United States v. Jones*, 759 F.2d 633, 643 (8th Cir.) (quoting *United States v. Rose*, 731 F.2d 1337, 1342 (8th Cir.), *cert. denied*, 469 U.S. 931, 105 S.Ct. 326, 83 L.Ed.2d 263 (1984)), *cert. denied*, 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985). Time is an important factor in distinguishing between an investigative stop and a de facto arrest: There

is "no rigid time limitation on *Terry* stops," *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), but a stop may be too long if it involves "delay unnecessary to the legitimate investigation of the law enforcement officers," *id.* at 687, 105 S.Ct. at 1576. Another factor is "the degree of fear and humiliation that the police conduct engenders." *United States v. Lego*, 855 F.2d 542, 544-45 (8th Cir. 1988) (citation omitted). The courts have also held that transporting a suspect to another location or isolating him from others can create an arrest. *See* [*United States v.*] *Rose*, 731 F.2d [1337, 1342 (8th Cir. 1988)]. Additional factors that may weigh in favor of an arrest are subjecting a suspect to unnecessary delays, handcuffing him, or confining him in a police car. *See* [*United States v.*] *Willis*, 967 F.2d [1220, 1224 (8th Cir. 1992)].

*United States v. Bloomfield*, 40 F.3d 910, 916-17 (8th Cir. 1994).

The evidence in this case establishes that the two NSP officers who contacted Mr. Garden at his workplace were not conducting an investigation. Rather, their role was to detain Mr. Garden while his house was being searched and, with his consent, to transport him to that location, where he was then questioned by two other officers who were conducting the search. The first two officers also succeeded in locating and taking possession of Mr. Garden's cell phone before transporting him in handcuffs. Mr. Garden was detained for approximately 2 hours, and was interviewed for about 1½ hours. During most of that time, he was confined in a vehicle with two officers.

Sergeant Brian Jones and Investigator David Hanselmann arrived at the office of Midwest Refuse, Mr. Garden's employer, at 10:15 a.m. on September 18, 2013. Because Mr. Garden was on his garbage collection route, the officers did not make contact with him until 10:40 a.m., when he returned to the office after being radioed to do so by the office manager. The officers immediately advised Mr. Garden that he was being detained while a search warrant was being executed at his house.[5] The

---

[5] The house search had begun at 10:15 a.m. The search warrant was served on a woman who answered the door. (Tr. 89:4-16; ; 109:15-17; 123:8-22).

officers provided Mr. Garden with a copy of the search warrant and then asked if he would accompany them to the house. Mr. Garden agreed. Had he not agreed, the officers would have continued to detain Mr. Garden and contacted one of the NSP officers who were executing the search warrant, either Sergeant Drew Ferguson or Sergeant Eric Jones, for further instructions. (Tr. 6:22-8:3-6; 9:9-15; 10:1-10; 12:20-13:1; 63:2-7).

Before transporting Mr. Garden in the front passenger seat of an unmarked vehicle, the officers handcuffed him and conducted a pat-down search. The officers asked if Mr. Garden had any property he needed to retrieve before leaving, and were told that Mr. Garden's keys, wallet, and cell phone were in the garbage truck he had been driving. Mr. Garden gave the officers permission to retrieve these items, which Inv. Hanselmann then kept in his possession while Mr. Garden was being transported. The trip took 10 to 15 minutes. (Tr. 13:4-14:16; 15:15-25; 23:21-24:8; 26:2-21; 29:17-30:7; 33:23-34:9; 39:22-41:24; 42:5-21).

Neither officer asked Mr. Garden any questions about suspected criminal activity (Tr. 10:20-25; 15:1-14; 34:10-13). As Inv. Hanselmann testified, "[W]e weren't asking him any questions of an investigative nature. That was not our purpose." (Tr. 46:2-3).

According to Inv. Hanselmann, the decision to transport Mr. Garden  was made in a telephone conversation between Sgt. Brian Jones and Sgt. Ferguson shortly after contact was made with Mr. Garden at his workplace. (Tr. 53:5-54:16). Sgt. Jones could not recall how or when the decision was made. (Tr. 19:20-20:14; 20:23-21:1). However, Sgt. Ferguson, who acted as duty supervisor for the operation, testified that he instructed Sgt. Jones and Inv. Hanselmann "to proceed to Mr. Garden's place of employment and see if they could call him back to the [Midwest Refuse] building as we had information he was mobile in the area . . . , make contact with him, and if they were able to make contact with him, if they could retrieve him and bring him back to the search warrant location." (Tr. 129:16-25; 135:23-136:9).

6

Sgt. Jones admitted that another part of his and Inv. Hanselmann's assignment was to take control of Mr. Garden's cell phone if they could find it. (Tr. 24:9-14; 25:9-14). After arriving outside Mr. Garden's house at 11:05 a.m., they delivered his cell phone and other personal items to Inv. Townsend or Sgt. Eric Jones. (Tr. 15:23-25; 32:19-33:8; 59:3-60:12; 79:8-19; 93:14-95:2; 109:3-14).

Mr. Garden was placed in the custody of Inv. Townsend and Sgt. Ferguson for questioning. The handcuffs were removed and Mr. Garden was put in another vehicle. He was advised of his *Miranda* rights before being questioned. (Tr. 30:13-32:19; 44:20-45:22; 72:8-17; 74:20-75:5).

After some preliminary questioning, Inv. Townsend asked, "Is it okay if our guys search your phone, too?" Mr. Garden consented. When Sgt. Eric Jones was notified at 11:17 a.m. that Mr. Garden's consent had been obtained, he first used a Cellebrite examination tool to extract the cell phone's data and store it on a thumb drive. Next, he manually searched the phone, reviewing emails, web browser history, and other contents. Finally, Sgt. Jones removed the phone's SD card, which he gave to a state patrol analyst who was also on site. The SD card was found to contain a photo of a clothed female who was photographing herself in a bathroom mirror. The photo matched the profile picture for "kenziegarden" on the Tagged.com website. (Tr. 78:18-79:25; 82:6-15; 103:17-105:19; 110:7-114:6).

When Inv. Townsend was told about this photo, the cell phone was seized "for safekeeping until we could follow it up with a search warrant . . .." (Tr. 82:8-16). The search warrant for the cell phone was obtained over a month later, on October 28, 2013. (Filing No. 41-4). The phone would not have been returned to Mr. Garden if he had asked for it. (Tr. 98:6-22). After the house search and interview were concluded, Mr. Garden was transported back to his workplace (Tr. 81:17-21; 134:6-14).

The photo found on the cell phone connects Mr. Garden to the February 25-26, 2013 chat on the Tagged.com website, and arguably would have provided probable

7

cause for his arrest. But at the time Mr. Garden was first detained, the only evidence of such connection the officers had was an IP address, which although registered to Mr. Garden could have been used by other individuals at the residence (or even in the neighborhood, if a wireless router was connected to the modem), and the fictitious user name, "Kenzie Garden." Also, the officers did not even know whether the email exchanges that were referenced in the Tagged.com chat actually contained images of child pornography. The limited amount of information that was set forth in the September 18, 2013 affidavit for the residential search warrant did not provide probable cause for Mr. Garden's arrest, and it has not been shown that the officers who detained Mr. Garden had any additional information to indicate that he had committed a crime.

"Probable cause exists when the totality of circumstances demonstrates that a prudent person would believe that the arrestee has committed or was committing a crime." _Kuehl v. Burtis_, 173 F.3d 646, 650 (8th Cir. 1999). The court "must give law enforcement officers substantial latitude in interpreting and drawing inferences from factual circumstances, but such latitude is not without limits." _Id._ (quotation marks and citation omitted). "First, because the _totality_ of circumstances determines the existence of probable cause, evidence that tends to negate the possibility that a suspect has committed a crime is relevant to whether the officer has probable cause." _Id._ (emphasis in original). "Second and relatedly, law enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as law enforcement would not be unduly hampered if the agents wait to obtain more facts before seeking to arrest." _Id._ (quotation marks and alterations omitted). "An officer need not conduct a 'mini-trial' before making an arrest, but probable cause does not exist when a 'minimal further investigation' would have exonerated the suspect." _Id._ (citation omitted).

"[F]or the statements given to police after an unlawful arrest to be admissible, the statement must not only be voluntary under Fifth Amendment standards but must not be the result of an unconstitutional seizure. _United States v. Reinholz_, 245 F.3d

8

765, 779 (8th Cir. 2001) (citing *Brown v. Illinois,* 422 U.S. 590, 602, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)). Four factors are evaluated to determine whether statements made to the police after an illegal arrest are admissible: "(1) whether the suspect has been advised of his *Miranda* rights prior to giving his statement; (2) the temporal proximity of his statements to his illegal seizure; (3) the existence of intervening causes between the illegal arrest and the statements; and (4) the purpose or flagrancy of the official misconduct." *Id.*

In the *Reinholz* case, the Omaha police received a tip from a pharmacist that the defendant had purchased iodine crystals, which can be used for manufacturing methamphetamine. The defendant did not have a criminal record, but he lived with a woman who had been convicted of drug charges. Trash bags the police retrieved from outside her house were found to contain twenty hypodermic syringes with methamphetamine residue, and also a brass pipe with cocaine residue. The police obtained a search warrant for the house and the defendant's person. Two officers approached the defendant as he was leaving work and told him about the search warrant. They then patted him down for weapons, handcuffed him, placed him in the back of an unmarked police car, and drove for 25 minutes. The officers informed the defendant they were taking him to his residence to execute the search warrant. They stopped at a junior high school parking lot located close to the house, at which time the defendant volunteered that any drug paraphernalia found in the house was his and not the woman's. The defendant was read his *Miranda* rights while still handcuffed and sitting in the back of the unmarked police car. He waived his rights and agreed to talk. He repeated his statement about the drug paraphernalia. The defendant also agreed to accompany the police executing the search warrant. After a meth lab was found in the garage, and after the defendant was again advised of his *Miranda* rights, the defendant admitted that he had manufactured methamphetamine two days before. The Eighth Circuit ruled that the defendant was arrested without probable cause when he was handcuffed in his employer's parking lot, and that his subsequent statements were "inadmissible because the *Miranda* warnings did not purge the taint of his illegal arrest." *Id.* at 780.

9

The facts of the present case are strikingly similar to *Reinholz*. Even though Mr. Garden was advised of his *Miranda* rights before being questioned, and was cooperative throughout his 2-hour unlawful detention, any statements Mr. Garden made to Inv. Townsend and Sgt. Ferguson resulted directly from his illegal seizure and are not admissible in evidence.

Similarly, even though Mr. Garden voluntarily consented to the search of his cell phone, the officers would not have come into possession of the phone but for their illegal seizure of his person. Because Mr. Garden's consent to the search was obtained during his unlawful detention, it was ineffective.

> In a "fruit of the poisonous tree" doctrine case, a constitutional violation has occurred, and the issue is whether law enforcement obtained evidence "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). "[V]oluntary consent to search, which was preceded by an illegal police action does not automatically purge the taint of an illegal [seizure]." *United States v. Esquivel,* 507 F.3d 1154, 1160 (8th Cir.2007) (quotation omitted). Rather, to purge the taint, *i.e.* prevent the application of the "fruit of the poisonous tree" doctrine, the government bears the burden of demonstrating that the voluntary consent was an independent, lawful cause of the search. *See United States v. Yousif,* 308 F.3d 820, 830 (8th Cir. 2002).

*United States v. Alvarez-Manzo*, 570 F.3d 1070, 1077 (8th Cir. 2009) (affirming grant of defendant's motion to suppress where government failed to demonstrate that causal connection between illegal seizures and defendant's consent was broken); *see also Royer*, 460 U.S. at 507-08 ("Because . . . Royer was being illegally detained when he consented to the search of his luggage, . . .the consent was tainted by the illegality and was ineffective to justify the search.").

Accordingly,

10

IT IS ORDERED:

1.    The magistrate judge's findings and recommendation (Filing No. 53) are
      <u>not</u> adopted, except for findings of fact.

2.    The defendant's statement of objections (Filing No. 57) is sustained.

3.    The defendant's motion to suppress (Filing No. 31) is granted, and the
      following evidence is hereby excluded:

      a.    All statements made by the defendant to the Nebraska State Patrol
            on September 18, 2013.

      b.    All contents of the defendant's cell phone, which was seized by
            the Nebraska State Patrol on September 18, 2013.

October 15, 2015.                         BY THE COURT:

                                          *Richard G. Kopf*
                                          Senior United States District Judge

---

\*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District
Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third
parties or the services or products they provide on their Web sites. Likewise, the court has no
agreements with any of these third parties or their Web sites. The court accepts no responsibility
for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work
or directs the user to some other site does not affect the opinion of the court.